Good morning, Justices. Judges. My name is Boris Valajan, and I'm appearing on behalf of the petitioner, Shakhijanyan. And the basis of the appeal, as the Court probably is aware since they read the brief already, is on behalf of the petitioner, we believe that I.J. erred in his determination as to credibility. I think he found some of the minor inconsistencies in the testimony of the Respondent and the witness. I'm not sure there's anything more substantial in terms of inconsistencies. What's minor about them? Well, Your Honor, what I'm trying to allude to is that if we were to glean over the asylum application. Well, why don't we look at the testimony you elicited? You were counsel before the I.J., weren't you? Yes, I was, Your Honor. Mr. Valajanyan to Ms. Rakhanyan. Question. The judge just now asked you, as far as to what has your mother testified, this is of the daughter. Was that the only reason your mom came to the United States? Yes. I recall that statement, Your Honor. That pretty much negates all the other reasons, doesn't it? I don't believe so, Your Honor. Why not? I think if we were to look at the totality of comparing the Respondent's I-589 application for asylum and her statements as to persecution in Armenia as a result of belonging to the Jehovah's Witnesses, I think that's the only reason that she came to the United States. She came to the United States as a member of the Jehovah's Witness religious group, and as the Court is aware, there's a 2002, I believe, State Department review on the persecution that religious minorities in Armenia still experience, and the experience she had there in Armenia as a result of authorities taking action against her because of her belief, and in our opinion, also the belief that she also, has a great possibility, if not a probability, of having future persecution if she was returned to Armenia because of her belief, and if we also take Her testimony was questioned. Ma'am, did you have any problems in Armenia in the hands of the government? Answer, what difficulties? No, no, nothing. Your Honor, I would also point the justices to review the daughter's testimony, where she, the daughter also indicates to the IJ that she believed through her phone conversations with her mother when her mother was in Armenia, and I think those occurred approximately once a month, that her mom had related to the daughter persecution at the hands of the authorities being badgered by the government. None of which the petitioner acknowledged or testified to before the IJ. The petitioner said she had no troubles with the government, and when the daughter was asked by you, why'd she come, your mother's testifying, question, your mother's testifying under oath, she came to the United States after your father died because she didn't have anyone to support her in Armenia, and because she wanted to live better and live with you here. Is that true? Answer, yes. A couple minutes later, the judge is now asking you as far as what you had your mother testify, was that the only reason your mom came to the United States? Answer, yes. So how does that make out a case? I think we have to look at the totality of everything, Your Honor. And if we look at the penumbra, what is elicited by the daughter, we're looking at one statement that the daughter is making. Obviously, any parent who has a daughter or a son living in another country, and if they're a widow in their home country, would desire to move and be next to that child. Otherwise, Your Honor, there wouldn't be any reason why she wouldn't want to move to Japan, then, and live there. Okay, accepting that, what comes across from this record and, indeed, specifically, explicitly from the daughter is that the petitioner was elderly. How old was she at the time of the hearing? I believe, Your Honor, she was on or about 78 years old. 78 years old. And there's some explicit testimony from the daughter that she doesn't have memory. That is, the mother doesn't. She forgets everything. She's forgetting everything. She has severe dizziness, and her blood pressure is very high, and now her hearing is very bad. There is in the record, I'm not sure what was made of it, but this is ER 141, the January 21, 2002, statement from the Broadway, from New Bar, Genoian, treating physician, that the petitioner, who at that point in 2002 was described as a pleasant 76-year-old woman, is presently suffering from, among other things, including severe hearing loss, idiopathic mental regression. Now, what happened in the proceeding, if anything, to address the mental capacity of the petitioner? If I recall correctly, Your Honor, at the previous mastery hearings, when the judge, I believe, was getting ready to set this matter for a merits hearing, and even during the merits hearing, if I recall correctly, Your Honor, I did allude to the IJ that I was having a problem communicating with this. Well, I see that. I mean, that's in the record. Right. What was made of this document, 141? This document, Your Honor, was attached to the motion to continue, to continue the matter because the respondent wasn't feeling well enough, I believe, to appear in court for the next step. That's a physical disability. Well, according to the doctor's report here, Your Honor, there's --- It might help if you let me finish the question a lot easier, more focused. You have you're asking the daughter about the health of the mother, specifically raise that. That's what makes me and the IJ was quite concerned at the beginning. We wanted to make sure, at least as the record reflects, that you really did want to proceed, and you went out and met with the family and came back and said you were going to submit just on the application. Then all of this testimony gets triggered by the petitioner being put on the stand and then being examined first by the IJ and then by the government's counsel. So I'm trying to understand, you know, in some proceedings it would be a competency hearing. The testimony of the petitioner comes across on the transcript anyway as a very confused woman. I don't know what to make of it because I don't see anything on the record that's arguing to the judge that, other than through perhaps the testimony of the daughter, that there is a reason for her inability to corroborate what was in the application. If I recall accurately, Your Honor, I think at the very beginning of the proceeding, I think the IJ and I had a discussion over that matter, and I met during a brief recess with the Respondent and the daughter and discussed whether or not they still wished to proceed or would they like to get a short continuance in terms of factoring and whether her mom's memory by chance would be improved by the delay. And I think from recollection, again, we discussed that if her condition had already deteriorated since she came to this country from Armenia, and I'm not a medical doctor, of course, but I don't believe there would have been a chance where her memory would have improved. Well, I'm assuming that. I mean, it looks like she's going to ‑‑I'm just trying to understand what the process is where you have the only precipient witness is the petitioner, and her mental state seems, I don't know what an idiopathic mental regression means, but the document's there. So I don't know what weight, if at all, we should give in resolving the credibility issues and support for the testimony, what weight we should give to the answers of the mother or, more particularly, the inability to answer. Well, Your Honor, I may point the Court out to another document in the file. It's AR 133 also that was previously, you know, alluded to by a psychologist in her case. The only thing I can say to the Court in the short time I have is I think that with the inconsistent statements that the IJ perceived the respondent and or the daughter make, and I don't think go to the material aspect of her asylum application and the Gates persecution as being also a reason why she came to the United States. If she were a perfectly lucid 50‑year‑old who had perfect memory, I wouldn't agree with you at all. I mean, I think her inability to corroborate or support. We get many, many cases where the testimony on the stand is totally inconsistent and often it's said, well, I don't know what was in the application. I couldn't read the English, and it wasn't read to me, and they're disavowing anything in the application. So I don't think we can rely on that basis. Well, Your Honor, I don't think I would disagree with that analysis of yours if she was perfectly lucid at 50, but we're dealing with a lady now obviously past 78, and at the time she may have not had the clear focus. Yeah, but that's what I'm having a little trouble with at the record. But my issue here is I don't think her credibility has been impugned by some of the, what I would characterize minor inconsistencies in her testimony and or her daughter's testimony. Counsel, they're only minor because she's not a lucid 50‑year‑old. So anyway, I think we have your position, so I'll give you a minute on rebuttal if there's anything left to say. Thank you, Your Honor. Thank you. Yes, please, your Court. Nathaniel Bollock on behalf of the Respondent. I think that Your Honors have focused in on the issues of this case, that adverse credibility determination is, I think, plainly supported by the testimony that Judge  is in fact to be taken seriously at that time, but you can't help but think this whole process is way off the tracks. I'm not sure she would understand the sky is blue at the time she was testimonying. She clearly had no sense of what it was about, and what are we supposed to do about that? I think that's an issue that the IJ reckoned with. I mean, the IJ, I think the record reflects that the IJ was concerned about her mental abilities and gave the opportunity for a continuance, presumably to come up with some sort of evidence in order to support her asylum application. To come up with? Fly somebody in from Armenia? Well, I don't know if she could provide other witnesses or documents. She did. She provided her daughter. Her daughter gave the best. Her daughter also didn't. Sorry. You know, counsel, if we don't get to ask our questions or make our speeches, you're going to wind up, you know, we're just using up your time. The daughter testified. You know, it's clear. I'm not faulting the IJ for the process. The IJ was quite concerned at the outset of this proceeding, at least as reflected on the record. And there was this recess given, or this continuance, a short continuance given to go out in the hallway and figure out between counsel and his client and the family as to what they wanted to do. And their option, the exercise was, apparently in recognition that the petitioner would not be a terrific witness, is that they'd rely on the asylum application. But you or whoever was representing the government wanted to make sure, and the IJ gave you, the opportunity to cross-examine the petitioner. So she comes on the stand, and then we have this totally garbled testimony, wherein she does, and the daughter does corroborate, that there were instances of, at least reported by the daughter, of phone calls where her mother from Armenia was saying that she had been hassled and beaten, and the daughter saying, you know, the Jehovah's Witnesses have come to the house, that she does have. So if you look at the entirety of the record, there is testimony that supports the application. What do we do with all that, given the fact that on the face of it, it seems that this elderly woman is essentially not competent as a testimonial witness? I'd say two things. One is, as you pointed out, Judge Fischer, that the daughter seemed essentially to refute everything that she had said prior by saying, answering first the IJ's question, isn't essentially the reason that your mother came to this country after her husband had died, was to be supported by you because she could no longer work in Armenia? The daughter says yes. If I had been the IJ, I probably would have wanted to clarify that, because obviously in light of everything else that was being said, she may have literally answered the question truthfully. That was the reason she came, as counsel said. Why else would the mother come to live with her in Glendale in a strange country, if it wasn't to be with her family? Did you mean therefore she didn't come for any other reason? It would have been an interesting opportunity for the witness to explain or address the ambiguity, don't you think? I do think so, and I believe that Petitioner's Counsel attempted to do just that by saying was that the only reason your mother came to the United States, to which the daughter responded yes, as you know. That's true. But there was no follow-up to that at all. As Judge Fischer just asked, what the best question from the IJ had been to flush that out a little bit, we do have people testifying in Armenian, correct? So did the daughter? That's correct. Both the Petitioner and the daughter, I believe, testified through the translator in Armenian. I agree. It would have been much better if there had been a further opportunity to explain, and perhaps it would have given the IJ the opportunity to make a credibility determination or find that the daughter was not as inconsistent as she seemed to be. I think the IJ was in a position, based on this testimony, where there was – it was obviously clear that the Petitioner had refuted pretty much everything in the asylum application, as Your Honors have pointed out. Her mental – So in a way that raised questions about whether she had the understanding, which inevitably gets me to the question that, as a court, we may not be able to speak very well to, but I can't help but wonder what in heaven's name are we doing here? I mean, she's got to be like 82 now. Indications that at least four years ago she was only partially aware of what seemed to be going on then. It's not likely that's gotten any better. I don't know. It's the Department of Homeland Security that ultimately calls the shots, but I'm not sure that anybody is real comfortable with the image of tossing this woman back to Armenia where there's nobody left anymore. And so is there anything else that can be done about this? I had exactly the same question when I got the case a few months ago. It can't be your favorite case when it hits the desk. Certainly not. And what I did, in fact, was I made some inquiries to the Department of Homeland Security, and I found out that there's something called deferred action or administrative stay of deportation. And it's a process by which a petitioner can request, through filling out a form known as I-246, deferred action. And it can be basically an executive decision not to execute a valid deportation order based on humanitarian grounds. The most common reason for the request are serious medical conditions, and that's also the most common reason for the grant of the request. I can even tell you that where you would send such a request would be to the field office director of detention and removal here in Los Angeles. And that's an administrative determination that's not reviewable by this court. And I obviously can't make any representations about what would happen, because I'm not in charge or involved in that process. But I think it might be a valuable thing to do in this case. Okay. Counsel, that is a very appreciated effort on your part. Thanks. If there are any further questions. And report that to your supervisors. Absolutely. We often get a little unhappy at times. We're all in an awkward situation with these cases. So please convey the appreciation of the court. I will. Whatever the decision is on the merits, nonetheless, your initiative in that regard is much appreciated. Thank you. Counsel, do you have anything more to say? If so, other than, Your Honor, just to reiterate again, I know the court has been very cognizant of the daughter's testimony in her last statement she made at the conclusion of the merits hearing. And I would just implore the court just to take into consideration not only that statement, by itself, but also take deference to the asylum application of the petitioner, her age and her mental condition of not being totally clear in all her responses. And as the court has made mention that, obviously, any parent would desire to live with a child wherever they're living. I think we understand the equities of the case. And that's basically what I conclude on that basis, Your Honor. All right. Thank you for the argument very much. And the case is submitted. We'll take a short recess before we get to the last two cases on calendar. Before we do that, let me just state for the record that the next case on calendar is Alexanian versus Gonzalez, which has been submitted. All rise. The court will stand at recess for approximately five minutes. And the next case to argue will be Porter versus McPherson. Can we approach them? Yeah. You can set up. All right. Thank you. All right. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you so much. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you so much. Thank you. Thank you. Thank you. Thank you.   Thank you. I'll take it. Thank you. Thank you. Thank you.  I'll take it. Thank you.    Thank you.      Thank you. Thank you. Thank you. Thank you. Thank you.  Thank you. Thank you. Thank you. Thank you. What is this? All rise. The United States Court of Appeals for the Ninth Circuit now resumes its session. You'll be seated. Thank you. Counsel, Porter v. McPherson now, I guess it is.
judges: Fisher, Clifton, Martinez